**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

MICHELE NICELY,              :
                               :
              Plaintiff       :     CIVIL ACTION NO. 4:10-CV-02412
                               :
           vs.               :        (Complaint Filed 11/19/10)
                               :
MICHAEL ASTRUE,          :
COMMISSIONER OF SOCIAL   :          (Judge Caputo)
SOCIAL SECURITY,         :
                               :
          Defendant     :

## MEMORANDUM

## BACKGROUND

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff Michele Nicely's claim for social security disability insurance benefits and supplemental security income benefits. For the reasons set forth below we will remand the case to the Commissioner for further proceedings.

Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes.  The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured."  It is undisputed that Nicely met the insured status requirements of the Social Security Act through December 31, 2003. Tr. 20, 23 and 255.[1]  In order to establish entitlement to disability insurance benefits Nicely was required

---

[1] References to "Tr.\_" are to pages of the administrative record filed by the Defendant as part of his Answer on February 4,  2010.

to establish that she suffered from a disability on or before that date. 42 U.S.C. § 423(a)(1)(A), (c)(1)(B); 20 C.F.R. §404.131(a)(2008); see Matullo v. Bowen, 926 F.2d 240, 244 (3d Cir. 1990).

Supplemental security income is a federal income supplement program funded by general tax revenues (not social security taxes). It is designed to help aged, blind or other disabled individuals who have little or no income. Insured status is irrelevant in determining a claimant's eligibility for supplemental security income benefits.

Nicely was born in the United States on July 8, 1949. Tr. 183 and 684. Nicely graduated from high school in 1967 and can read, write, speak and understand the English language. Tr. 237 and 684. After graduating from high school Nicely attended college for several years but never obtained a degree. Tr. 183, 186, 684 and 788. Nicely has past relevant employment[2] as a postal clerk which was described by a vocational expert as semi-skilled, light work as generally performed but that Nicely did engage in some heavy exertional duties.[3] Tr. 786.

---

[2]Past relevant employment in the present case means work performed by Nicely during the 15 years prior to the date her claim for disability was adjudicated by the Commissioner. 20 C.F.R. §§ 404.1560 and 404.1565.

[3]The terms sedentary, light, medium and heavy work are defined in the regulations of the Social Security Administration as follows:

> (a) *Sedentary work*. Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

(continued...)

Nicely  commenced employment in 1968. Tr. 197.  Records of the Social Security Administration reveal that Nicely had employment in 1968 through 1977, 1980 and 1981, 1984 through1995, and 1997 through 2000.  Tr. 214.  There are no earnings reported in the years 1978, 1979, 1982 and 1983.  Id.  During the 15 years from 1986 through 2000, Nicely's earnings were as follows:

| | |
|---|---|
| 1986 | $18566.27 |
| 1987 | 20538.89 |
| 1988 | 21375.90 |

---

[3](...continued)
(b) *Light work*.  Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as  loss of fine dexterity or inability to sit for long periods of time.

(c) *Medium work*.  Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.  If someone can do medium work, we determine that he or she can do sedentary and light work.

(d) *Heavy work*.  Heavy work involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If someone can do heavy work, we determine that he or she can also do medium, light, and sedentary work.

20 C.F.R. §§ 404.1567 and 416.967.

| | |
|---|---|
| 1989 | 23923.84 |
| 1990 | 25654.06 |
| 1991 | 28372.83 |
| 1992 | 30196.30 |
| 1993 | 29301.75 |
| 1994 | 27713.67 |
| 1995 | 19634.91 |
| 1996 | 0.00 |
| 1997 | 33670.11 |
| 1998 | 14964.98 |
| 1999 | 5985.31 |
| 2000 | 209.00 |

Id.  Nicely's total earnings from 1968 through 2000 were $340,874.90. Id.  There are no earnings reported after the year 2000.[4] Id.

Nicely claims that she became disabled on April 30, 1999, because of both physical and mental impairments. Tr. 183-185 and 238.  The record reveals that Nicely complained of headaches, low back and leg pain, fatigue, anxiety and depression. Tr.  261, 365, 380 and 384-385.

This case has a long and tortuous procedural history.  On October 29, 2001, Nicely filed protectively[5] an application for disability insurance benefits and an application for

---

[4]It does appear that Nicely worked as a grocery store clerk, a telemarketer and a nursing assistant at a nursing home for very brief periods in 2000 and 2001.  Tr. 23, 239, 272 and 787.  These positions apparently did not last long allegedly because of Nicely's physical and mental problems.  The administrative law judge found that this work was not substantial gainful activity. Tr. 23.  The record also indicates that Nicely received a worker's compensation settlement from the United States Postal Service. Tr. 37, 231 and 242.

[5]Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits.  A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

supplemental security income benefits.[6]  Tr. 19, 183-185, 217 and 255.  On May 7, 2002,

the Bureau of Disability Determination[7] denied Nicely's applications. Tr. 19, 41 and 75-78.

On June 27, 2002, Nicely requested a hearing before an administrative law judge. Tr. 79.

A hearing before an administrative law judge was held on November 20, 2002.  Tr. 19, 109

and 115.   The transcript of that hearing is missing from the administrative record.   On

January 30, 2003, the administrative law judge issued a decision denying Nicely's

applications. Tr. 47-54.  The administrative law judge found that Nicely was not disabled

because Nicely had the residual functional capacity to perform a limited range of sedentary

work[8] and that Nicely's  "past relevant work as mail clerk did not require the performance of

work related activities precluded by her residual functional capacity[.]" [9]  Tr. 54. On February

---

[6]We scoured the record which consists of 792 pages and did not locate the application for supplemental security income benefits.

[7]The Bureau of Disability Determination is an agency of the state which initially evaluates applications for disability insurance benefits and supplemental security income benefits on behalf of the Social Security Administration.  Tr. 75.

[8]The administrative law judge found that Nicely "retain[ed] the ability to lift/carry/push/pull 10 pounds, sit 6 hours in an 8 hour day and stand/walk 2 hours in an 8 hour day" and that "she ha[d] occasional limitations in the ability to maintain attention and concentration for extended periods of time." Tr. 53.  The time frame for this residual functional capacity was April 30, 1999, through the date of the administrative law judge's decision. Tr. 54.

[9]Nicely was 53 years of age on the date of the administrative hearing and on the date the ALJ issued his decision.  Under the Social Security regulations a person 50 to 54 years of age is considered a "person closely approaching advanced age."  20 C.F.R. §§ 404.1563(c) and 416.963(c).  The Social Security Administration considers a claimant 50 to 54 who has a severe impairment and limited work experience as someone who may not be able to adjust to other work. Id.  If Nicely would have been limited to sedentary work (as she in fact was by the ALJ)  and also found to have no transferable job skills and unable to perform her prior relevant work by the administrative law judge, she would have been entitled to disability insurance benefits. See Medical-Vocational Rules 201.00(g) and

(continued...)

5, 2003, Nicely requested that the Appeals Council review the administrative law judge's decision. Tr. 117-118. After 18 months had passed, the Appeals Council on August 6, 2004, issued a decision remanding the case to the administrative law judge for further proceedings. Tr. 125-127. The Appeals Council noted that (1) the administrative law judge's decision did not contain an evaluation of Nicely's past relevant work as a mail handler and the record was insufficient to determine whether Nicely could perform her past relevant work , and (2) the hearing tape was partially inaudible making the record incomplete. Tr. 126.

A second administrative hearing was held before the same administrative law judge on April 21, 2005. Tr. 19,  128 and 142.   The transcript of this hearing is also missing from the administrative record.   On October 25, 2005, the administrative law judge issued a decision denying Nicely's application for disability insurance benefits and granting Nicely's application for supplemental security income benefits as of July 19, 2005. Tr. 55-68.  The administrative law judge found that from April 30, 1999, her alleged disability onset date through and including December 31, 1999, Nicely had engaged in substantial gainful  activity and was not disabled during that period. Tr. 67.  He further found that since January 1, 2000, Nicely had a severe impairment[10] but that from that date through and including July 18, 2005, Nicely retained the residual functional capacity  necessary to perform a limited range of light

_____

[9](...continued)
201.6, 20 C.F.R. Part 404, Subpart P, Appendix 2.

[10]The administrative law judge found that Nicely had the following severe impairments: depressive disorder, bipolar disorder and degenerative disc disease of the lumbar spine. Tr. 60.  He further found that Nicely had the following non-severe impairments: hepatitis C, a March 2004 left-brain stroke and a past history of significant marijuana, cocaine and heroin abuse. Id.   In our review of the record in this case, we discerned no evidence that Nicely used cocaine, heroin, and marijuana  on or after her alleged disability onset date of April 30, 1999.

work and retained the capacity to perform her past relevant work as a mail handler and sorter. Id.  Consequently, she was not entitled to disability insurance benefits because the date last insured was December 31, 2003.[11]  However, commencing on July 19, 2005, the day that Nicely underwent an evaluation by William Jamack, D.O., a state agency psychiatrist, the administrative law judge found that Nicely was disabled based upon the application of GRID Rule 202.06[12] and was eligible for supplemental security income benefits.  Tr. 67.

On November 4, 2005, Nicely requested that the Appeals Council review the

_____

[11]Nicely was 55 years of age on the date of the administrative hearing and 56 on the date the ALJ issued his decision.  Under the Social Security regulations a person 55 years of age and older is considered a "person of advanced age."  20 C.F.R. §§ 404.1563(e) and 416.963(e). The Social Security Administration considers a claimant 55 years of age or older who has a severe impairment as someone whose age significantly affects his or her ability to adjust to other work and there are special rules governing the award of benefits to such a person. Id.  If Nicely would have been limited to light work and found to have no transferable job skills (as she in fact was by the ALJ) and also found unable to perform her prior relevant work by the administrative law judge, she would have been entitled to disability insurance benefits. See Medical-Vocational Rules 202.00(c) and  202.6, 20 C.F.R. Part 404, Subpart P, Appendix 2.

[12]Contained within the Social Security regulations are grids or tables which lists Rules 201.01 through 203.31 in the left hand column.  This grids or tables are found at 20 C.F.R. pt. 404, subpt. P, app. 2.  There are grids or tables for sedentary, light and medium work.  The Social Security regulations provide that "where the findings of fact made with respect to a particular individual's vocational factors and residual functional capacity coincide with all of the criteria of a particular rule, the rule directs a conclusion as to whether the individual is or is not disabled." Rule 200.00.  In the right hand column of the grid or table is set forth the "Decision" as to whether a claimant is "disabled" or "not disabled."   If all of the criteria of particular Rule are met "[t]he existence of jobs in the national economy is reflected in the 'Decisions' shown in the rules, i.e., in promulgating the rules, administrative notice has been taken of the numbers (sic) of unskilled jobs that exist throughout the national economy at the various functional levels. . . Thus, when all factors coincide with the criteria of a rule, the existence of such jobs is established." Rule 200.00(b).  The administrative law judge states in his decision that he is relying on Rule 202.05 but from the context of his statement, it is clear that he is relying on Rule 202.06.

portion of the administrative law judge's decision which found that she was not disabled between April 29, 1999, and July 19, 2005, but asked that the Social Security Administration process the SSI benefits that were approved.  Tr. 143-144.   After 26 months had passed, the Appeals Council on January 9, 2009,  granted Nicely's request for review and remanded the case to a different administrative law judge for further proceedings. Tr. 69-74.   The Appeals Council directed, *inter alia*,   that the new administrative law judge (1) consider whether Nicely engaged in substantial gainful activity after her alleged onset date of April 30, 1999, (2) give further consideration to Nicely's maximum residual functional capacity during the entire period, and (3) give further consideration to treating source opinions and examining source opinions, and explain the weight given to such opinions. Tr. 73.

A third hearing was held on May 21, 2009, before a different administrative law judge. Tr. 770-792.   At that hearing Nicely testified and also a vocational expert Peter Manzi testified. Id.    On June 18, 2009, the administrative law judge issued a decision denying Nicely's application for disability insurance benefits and granting Nicely's application for supplemental security income benefits commencing on July 8, 2004. Tr. 19-37.   On August 3, 2009, Nicely requested that the Appeals Council review the administrative law judge's decision. Tr. 15 and 769.   After more than a year had passed, the  Appeals Council on October 8, 2010, concluded that there was no basis upon which to grant Nicely's request for review. Tr. 9-12.   Thus, the administrative law judge's decision stood as the final decision of the Commissioner.

On November 19, 2010, Nicely filed a complaint in this court requesting that we reverse the decision of the Commissioner denying her disability insurance benefits.   The Commissioner filed an answer to the complaint and a copy of the administrative record on

February 4, 2011.  After being granted one extension of time, Nicely filed her brief on May 5, 2011, and the Commissioner filed his brief on June 7, 2011.  The appeal[13] became ripe for disposition on June 8, 2010, when Nicely filed a reply brief.

## STANDARD OF REVIEW

When considering a social security appeal, we have plenary review of all legal issues decided by the Commissioner.  See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin.,  181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995).  However, our review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence."  Id.; Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993).  Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001)("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence.");  Keefe v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001);  Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of

---

[13]Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal."  M.D.Pa. Local Rule 83.40.1.

evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988)(quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008);  Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance.  Brown, 845 F.2d at 1213.  In an adequately developed factual record substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight."  Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence.  Mason, 994 F.2d at 1064.  The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-707.  Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole.  Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).

## SEQUENTIAL EVALUATION PROCESS

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical

or mental impairment which can be expected to result in death or which has lasted or can

be expected to last for a continuous period of not less than 12 months."   42 U.S.C. §

432(d)(1)(A).  Furthermore,

> [a]n individual shall be determined to be under a
> disability only if his physical or mental impairment
> or impairments are of such severity that he is not
> only unable to do his previous work but cannot,
> considering his age, education, and work experience,
> engage in any other kind of substantial gainful work
> which exists in the national economy, regardless of
> whether such work exists in the immediate area in which
> he lives, or whether a specific job vacancy exists for
> him, or whether he would be hired if he applied for
> work.  For purposes of the preceding sentence (with
> respect to any individual), "work which exists in the
> national economy" means work which exists in significant
> numbers either in the region where such individual
> lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in evaluating disability insurance

and supplemental security income claims.  See 20 C.F.R. §404.1520 and 20 C.F.R. §

416.920; Poulos, 474 F.3d at 91-92.  This process requires the Commissioner to consider,

in sequence, whether a claimant (1) is engaging in substantial gainful activity,[14] (2) has an

impairment that is severe or a combination of impairments that is severe,[15] (3) has an

---

[14]If the claimant is engaging in substantial gainful activity, the claimant is not disabled and the sequential evaluation proceeds no further.

[15] The determination of whether a claimant has any severe impairments, at step two of the sequential evaluation process, is a threshold test. 20 C.F.R. §§ 404.1520(c) and 416.920(c). If a claimant has no impairment or combination of impairments which significantly limits the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled" and the evaluation process ends at step two. Id.  If a claimant has any severe impairments, the evaluation process continues.  20 C.F.R. §§

(continued...)

impairment or combination of impairments that meets or equals the requirements of a listed impairment,[16] (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. Id.  As part of step four the administrative law judge must determine the claimant's residual functional capacity. Id.[17]

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996).  A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The residual functional capacity assessment must include a discussion of the individual's abilities.  Id; 20 C.F.R. §§ 404.1545 and 416.945; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

---

[15](...continued)
404.1520(d)-(g) and 416.920(d)-(g). Furthermore, all medically determinable impairments, severe and non-severe, are considered in the subsequent steps of the sequential evaluation process.  20 C.F.R. §§ 404.1523, 404.1545(a)(2), 416.923 and 416.945(a)(2).

[16]If the claimant has an impairment or combination of impairments that meets or equals a listed impairment, the claimant is disabled. If the claimant does not have an impairment or combination of impairments that meets or equals a listed impairment, the sequential evaluation process proceeds to the next step. 20 C.F.R. § 404.1525 explains that the listing of impairments "describes for each of the major body systems impairments that [are] consider[ed] to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience."  Section 404.1525 also explains that if an impairment does not meet or medically equal the criteria of a listing an applicant for benefits may still be found disabled at a later step in the sequential evaluation process.

[17]If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.

**MEDICAL RECORDS AND OTHER EVIDENCE**

Before we address the administrative law judge's decision and the arguments of counsel, we will review Nicely's activities of daily living and some of her medical records.

According to a document filed by Nicely with the Social Security Administration in 2001, she is 5 feet in height and weighs 130 pounds. Tr. 237.   In a medical report dated April 12, 2002, it was stated that Nicely weighed 160 pounds.   Tr. 385.

On a questionnaire completed in March 2002 for the Bureau of Disability Determination Nicely stated that she lives in an apartment with her son, daughter and granddaughter. Tr. 261-271.  Although she can no longer walk the children to and from school, she helps them with homework, and cooks and cleans with her daughter's help. Id. The document indicates that to reach the apartment and leave the apartment Nicely has to ascend and descend 24 steps. Id.   However, Nicely noted that "[I] can walk up my stairs slowly. I may stop after 7 steps if I must before continuing" and "I may go out 3 times a week - once up the stairs I usually stay." Tr. 263.  The document also indicates that she cannot shop for long periods of time and  she rests when she has to.  Sometimes, when shopping she carries 2 or 3 light plastic bags.  Tr. 262.  She does not shop for "long periods of time" and "will rest when necessary." Id.  Her daughter does the vacuuming, takes the trash out, and helps with cooking, cleaning, and shopping.  Tr. 261-262.  Nicely explained that she has to be careful getting in and out of the bathtub and she finds it difficult to put on pants and socks. Tr. 262.   She paces herself when dressing and with respect to all other activities. Tr. 264.

Nicely  does not drive. Tr. 262.   When Nicely has to go places she uses "medical transport" or friends drive her; she will take public transportation only when

necessary.  Id.   Nicely explained that she does not do anything strenuous or for a long period of time. Tr. 263.   She rests between activities.  She likes to read, write, draw and participate in Bible study. Tr. 263 and 265.  She starts books but rarely finishes them. Id. She tries to take walks but must walk slowly and rest frequently. Tr. 263.  She cannot sit or stand for long periods and must change position about every 20 minutes. Id.  She "thinks" she can lift 10 pounds but her back prevents her from lifting more. Id.  She stated that she had the ability to use a regular phone, use a standard size television remote control, use a knife and fork and fasten buttons, snaps and other clothing fasteners although she no longer wore shoes that required  her to tie shoe laces. Tr. 264.   Nicely stated that she needed no special reminders to take care of personal needs such as washing, bathing, shaving and dressing.  Id.    Nicely stated that she has problems concentrating and at time becomes "extremely anxious and defensive." Tr. 267.

Nicely wrote that she can make decisions on her own and had no trouble understanding instructions and carrying them out but that she sometimes becomes frustrated with changes in her daily schedule and living arrangements; she stated she becomes argumentative when she has a disagreement with someone.  Tr. 266.

Nicely stated that she has pain "sometimes [over her] entire back" and pain "radiating down the back of [her] legs." Tr. 268.  The pain is caused by "prolonged" bending, standing and walking. Id.  Nicely indicated that she is constantly fatigued. Tr. 267.  At the time she completed the March 2002 questionnaire Nicely was taking Remeron,[18] Klonopin,[19]

---

[18]"Remeron (mirtazapine) is a tetracyclic antidepressant.  It affects chemical in the brain that may become unbalanced and cause depression.  It is thought to increase the activity of norepinephrine and serotonin which help elevate mood.  Remeron is used to

(continued...)

Darvocet[20] and Tylenol. Tr. 266-267. Nicely stated that the medications eased her pain "somewhat." Tr. 269. She was unsure if the medications caused side effects. Id.

The administrative record contains no medical treatment records for the period April 30, 1999, through January, 2001. Nicely's primary care physician was Michael E. Callahan, D.O., who has a medical practice in Galeton, Pennsylvania. Tr. 371. Dr. Callahan first commenced treating Nicely in February, 2001, and was treating her at the time of the third administrative hearing. Tr. 371 and 778.[21] Dr. Callahan's handwritten treatment notes contained within the administrative record are mostly illegible.

On March 28, 2001, Nicely had an appointment with Dr. Callahan which appears to be primarily for Nicely's annual female health examination. Tr. 372-374. At that appointment Nicely complained of back pain. Tr. 372. One legible and anecdotal item in the notes of this appointment is a statement that Nicely was "seen walking from office [without] limp - upright and good stride." Id. It is not clear whether the note was made by Dr. Callahan, a nurse or a physician's assistant. Id. It appears that two individuals signed the

---

[18](...continued)
treat major depressive disorder." Remeron, Drugs.com, http://www.drugs.com /remeron.html (Last accessed February 17, 2012).

[19]"Klonopin (clonazepam) is in a group of drugs called benzodiazepine . . . Clonazepam affects chemical in the brain that may become unbalanced and cause anxiety. Klonopin is used to treat seizure disorders or panic disorder. " Klonopin, Drugs.com, http://www.drugs.com/klonopin.html (Last accessed February 17, 2012).

[20]Darvocet is a drug containing the narcotic pain reliever propoxyphene and acetaminophen. Darvocet, Drugs.com, http://www.drugs.com/darvocet.html (Last accessed February 17, 2012). It was withdrawn from the market in the United States in November 2010. Id.

[21]The last appointment with Dr. Callahan was two weeks before the administrative hearing.

note possibly Dr. Callahan and a nurse or a physician's assistant. Id.

A treatment note from March 29, 2001, appears to indicate that Nicely re-injured her back while pushing furniture and that she was complaining of low back pain radiating to her buttocks and legs. Tr. 371.  The objective findings at the appointment appear to be as follows: "NAD[,] gait station ok[,] [positive (illegible)][,] [illegible][,][negative (illegible)][,] [heel toe] walk ok[,] DTRs +2 [illegible][,] [sitting root negative], SLR neg[ative] [,][illegible][,] tender lumbar area." Tr. 370-371.  This note suggests that  Nicely was in no acute distress, her gait and station were normal, she could walk on her heels and toes, deep tendon reflexes were normal,  she had a negative straight leg raise test[22] and the lumbar area of her spine was tender to palpation.  Dr. Callahan's assessment was that Nicely was suffering from "low back pain" and he prescribed the drugs Ultram,[23] Toradol[24] and Klonopin. Tr. 370.   However, we are unable to decipher the entire note.

From March 30 through July 3, 2001, there are sporadic notes in Dr. Callahan's records regarding telephone calls from Nicely regarding, inter alia, prescription refills. Tr.

---

[22]The straight leg raise test is done to determine whether a patient with low back pain has an underlying herniated disc.  The patient, either lying or sitting with the knee straight, has his or her leg lifted.  The test is positive if pain is produced between 30 and 70 degrees. Niccola V. Hawkinson, DNP, RN, Testing for Herniated Discs: Straight Leg Raise, SpineUniverse, http://www.spineuniverse.com/experts/testing-herniated -discs-straight-leg-raise (Last accessed February 17, 2012).

[23]"Ultram (tramadol) is a narcotic-like pain reliever. Ultram is used to treat moderate to severe pain." Ultram, Drugs.com, http://www.drugs.com/ultram.html (Last accessed February 17, 2012).

[24]Toradol is a nonsteroidal anti-inflammatory drug "used short-term (5 days or less) to treat moderate to severe pain, usually after surgery. It is used alone or in combination with other medicines." Toradol, Drugs.com, http://www.drugs.com/toradol.html (Last accessed February 17, 2012).

369-370.  On July 5, 2001, Nicely had an appointment with Dr. Callahan regarding what appears to be a respiratory infection.  Tr. 368.   Dr. Callahan prescribed Robitussin-AC, a cough syrup which contains the narcotic codeine and the expectorant guaifenesin.[25] Id. The next appointment with Dr. Callahan where Nicely complained of low back pain was on August 30, 2001. 367-368.   The treatment notes are only partially legible and we will not attempt to decipher them.

On or about September 5, 2001, Dr. Callahan completed a document entitled "Pennsylvania Department of Public Welfare Employability Assessment Form." Tr. 357358. In that form Dr. Callahan stated that Nicely was permanently disabled because of back pain. Id.    He based his assessment on Nicely's clinical history. Id.

On September 24, 2001, Nicely had an appointment with Dr. Callahan at which she complained of a rash. Tr. 367.

On October 24, 2001, Nicely had an appointment at the Galeton Family Chiropractic Center regarding pain in her shoulders, back, buttocks and legs. Tr. 380.  A physical examination revealed a positive straight leg raising test with respect to the right leg, a positive Faber test,[26] and a positive Ely's test.[27] Tr. 382.

---

[25]Robitussin-AC, Drugs.com, http://www.drugs.com/mtm/robitussin-ac.html (Last visited February 17, 2012).

[26]The Faber test or Patrick's test is a pain provocation test which reveals problems at the hip and sacroiliac regions.  Faber is an acronym which stands for flexion, abduction and external rotation.

[27] The Ely's test is also known as the femoral nerve stretch test.  With the patient in the prone position, the knee is fully flexed touching the heel to the buttock. A positive test produces pain in the anterior thigh upon stretching the femoral nerve.   A positive Ely's test may suggest "a hip lesion, irritation of the Iliopsoas muscle or its sheath, inflammation of

(continued...)

On October 26, 2001, Nicely had an appointment with Dr. Callahan at which Nicely complained of back pain. Tr. 366.   Although Dr. Callahan's handwriting is barely legible, it appears that the physical examination findings were essentially normal or negative except for a notation that Nicely had decreased reflexes and a painful area in the thoracic and lumbar spine.  Id.  Dr. Callahan's diagnosis appears to be degenerative disc (or joint) disease of the spine.    Dr. Callahan prescribed the nonsteroidal anti-inflammatory drug Celebrex. Id.

There is a notation in Dr. Callahan's treatment records that Nicely telephoned his office on November 5, 2001, and reported that Celebrex was not "helping her back pain" and that Dr. Callahan authorized a prescription for Klonopin. Tr. 365.  In mid-November, 2001, Dr. Callahan authorized a refill of Robitussin-AC as needed for cough. Id.  On December 3, 2001, Dr. Callahan authorized a refill of the prescription for Klonopin. Id.

On January 4, 2002, Nicely had an appointment with Dr. Callahan at which Nicely complained of migraine headaches and back pain. Tr. 364-365.    Dr. Callahan's assessment was that Nicely was suffering from headaches, depression, anxiety and pruritus.[28]  Dr. Callahan prescribed the drugs Tegretol[29] and Remeron.  Id.

---

[27](...continued)
the lumbar nerve roots, or the presence of lumbar nerve root adhesions." Shaw Chiropractic Group, Information for Attorneys, Exam Glossary, http://www.shawchiropractic.com/attorneys/MORE_glossary.htm (Last accessed February 17, 2012). "A positive test indicates tightness in rectus femoris, or femoral nerve irritation due to lumbo-sacral lesion or hip lesion. It can also be a sign of protruding or bulging disc." Ely Test, Athletic Training & Sports Medicine Center, The University of West Alabama, http://at.uwa.edu/Special%20Tests/SpecialTests/LowerBody/Ely.htm (Last accessed February 17, 2012).

[28]Pruritus is defined as "itching; an unpleasant cutaneous sensation that provokes
(continued...)

Nicely had appointments with Dr. Callahan periodically throughout 2002 at which she complained of back pain and Dr. Callahan's assessments included that Nicely suffered from chronic low back pain, anxiety and depression.  Tr. 362, 363 and 421.  At an appointment on August 26, 2002, it appears[30] that Dr.Callahan found that Nicely's gait was normal and that she had a negative straight leg raise test. Tr. 421.  Even in light of those negative findings,  Dr. Callahan's assessment was that Nicely suffered from chronic low back pain and prescribed Darvocet,  Remeron and the sleep aid Ambien. Id.

On or about  April 4, 2002, Nicely was examined by Gregory Nedurian, M.D., on behalf of the Bureau of Disability Determination. Tr. 384-390.  Dr. Nedurian's physical examination findings appear to be essentially normal, including that Nicely had full range of motion in her extremities with no evidence of atrophy; she had excellent grip strength and her gait was normal.  Id.   Dr. Nedurian's assessment was that Nicely suffered from chronic low back discomfort and chronic depression.  Id.   Dr. Nedurian after examining Nicely completed a statement of Nicely's ability to perform work-related physical activities.[31] Id.  Dr. Nedurian's statement limits Nicely to the exertional requirements of sedentary work.  Id.  He stated that Nicely had the capacity to only frequently lift 2 to 3 pounds, stand and walk only

---

[28](...continued)
the desire to rub or scratch the skin to obtain relief." Dorland's Illustrated Medical Dictionary, 1376 (27th Ed. 1988).

[29]"Tegretol (carbamazepine) is an anticonvulsant. It works by decreasing nerve impulses that cause seizures and pain.  Tegretol is used to treat seizures and nerve pain . . . Carbamazepine is also used to treat bipolar disorder."  Tegretol, Drugs.com, http://www.drugs.com/tegretol.html (Last accessed February 17, 2012).

[30]The treatment note is mostly illegible.

[31]This statement is dated April 4, 2002. Tr. 388.

1 to 2 hours in an 8-hour workday, and sit 8 hours with a sit/stand option.  Id.  He further

indicated that Nicely was limited with respect to pushing and pulling with the upper and lower

extremities; Nicely could only occasionally bend, kneel, stoop, crouch, balance and climb;

Nicely had no limitations with respect to reaching, handling, fingering, feeling, seeing,

hearing, speaking, tasting/smelling and continence; and Nicely had no environmental

limitations.  Id.  Dr. Nedurian on or about April 26, 2002, completed a supplemental

questionnaire in which he stated that Nicely's mood was pleasant; her behavior appropriate;

her memory and orientation excellent; her concentration very good; her hygiene very good;

and her ability to communicate clearly, relate to office staff and follow directions pleasant and

appropriate. Tr. 391.

On September 4, 2002, Nicely had an MRI of the lumbar spine performed at

Charles Cole Memorial Hospital, Coudersport, Pennsylvania. Tr. 430.  The MRI revealed

"mild generalized disk desiccation[32] at all levels" but "no evidence of a herniated disk." Id.

---

[32]A vertebra consists of several elements, including  the vertebral body (which is the anterior portion of the vertebra), pedicles, laminae and the transverse processes.  The vertebral body is the largest part of the vertebra and is somewhat oval shaped. The pedicles are two short processes made of bone that protrude from the back of the vertebral body.  The laminae are two broad plates extending dorsally and medially from the pedicles and fusing to complete the vertebral arch (which is the posterior portion of the vertebra) and encloses the spinal cord.  On an axial view of the vertebra, the transverse processes are two somewhat wing-like structures that extend on both sides of the vertebral body from the point where the laminae join the pedicles. The transverse processes serve for the attachment of ligaments and muscles. The endplates are the top and bottom portions of a vertebral body that come in direct contact with the intervertebral discs.

The intervertebral discs (made of cartilage) are the cushions (shock absorbers) between the 24  bony vertebral bodies that make up the spinal column(if you count the fused vertebrae in the lower spine there are 33 vertebral bodies). Each disc is made of a tough outer layer and an inner core composed of a gelatin-like substance, the nucleus pulposus. The outer layer of an intervertebral disc is called the annulus fibrosus. Jill PG Urban and Sally Roberts, Degeneration of the intervertebral disc, PublicMed

(continued...)

The MRI further revealed "no significant spinal degenerative spinal stenosis" and the "neural foramen [were] widely patent at all levels." Id.

On September 23, 2002, Dr. Callahan completed a document entitled "Multiple Impairments Questionnaire" on behalf of Nicely. Tr. 462-469.  In that document Dr. Callahan stated that Nicely suffered from persistent low back pain and found that Nicely had physical exertional abilities and psychiatric impairments which did not permit Nicely to engage in full-time sedentary work. Tr. 464 and 467-468.

On September 30, 2002, Nicely had an appointment with Julie Ann Floyd, M.D., for evaluation of her low back pain and generalized body pain and fatigue.  Tr. 500-501.  Nicely was referred to Dr. Floyd by Dr. Callahan. Id.   Dr. Floyd's physical examination of Nicely was unremarkable except it revealed a positive straight leg raise "in the seated position for reproduction of low back pain," and

> [t]he lumbar spine is generally diminished. Range of motion with flexion.  This does seem to reproduce and exacerbate pain. Discomfort is noted around the lumbar paraspinals and surrounding muscles, adjacent to L4-5, L5-S1 . . . Trigger points are noted in the cervical paraspinals and trapezius muscles.  The neck is generally diminished range of motion with minimal complaint of pain around the cervical paraspinals.

Id.  Dr. Floyd's assessment was that Nicely suffered from low back and intermittent lower

---

[32](...continued)
Central,http://www.ncbi.nlm.nih.gov/pmc/articles/PMC165040/(Last accessed February 17, 2012); see also Herniated Intervertebral Disc Disease, Columbia University Medical Center, Department of Neurology, http://www.columbianeurosurgery.org/ conditions/herniated-intervertebral-disc-disease/ (Last accessed February 17, 2012). Disc dessication is when there is loss of water content or moisture in the discs, i.e., a dehydration of the discs.  When the discs dehydrate they become rigid and are more susceptible to injury, including tears in the annulus and disc herniation.

extremity pain,  discogenic low back pain with no neurologic deficit, generalized body pain and fatigue with the possibility of fibromyalgia syndrome, versus other centralized pain process,  deconditioning and overweight, and chronic pain. Tr. 501.    Dr. Floyd also suspected "an annular tear at L4-5 and/or L5-S1, that may be irritating the nerve root intermittently, giving a chemical radiculitis,[33] though the MRI at this point in time of course does not show any structural impingement." Id.   Dr. Floyd again  saw Nicely on October 29 and November 27, 2002, at which there were similar physical examination findings and assessments.  Tr. 498-499 and 510-511.

In a letter dated October 2, 2002, to Nicely's attorney, Dr. Callahan stated that Nicely was seen in his office on March 29, 2001, with complaints of low back pain; that Nicely had been pushing furniture and re-injured herself; that Nicely had previously sustained an injury while working for the post office; that Nicely's diagnosis was low back pain based upon her medical history and examinations; that he prescribed Ultram, Toradol, Klonopin,

---

[33]Radiculopathy is a condition where one or more nerves or nerve roots are affected and do not work properly. The nerve roots are branches of the spinal cord. They carry signals to the rest of the body at each level along the spine. The nerve roots exit through holes (foramen) in the bone of spine on the left and the right. Radiculopathy can be the result of a disc herniation or an injury causing foraminal impingement of an exiting nerve (the narrowing of the channel through which a nerve root passes). See, generally, Radiculopathy, MedicineNet.com, http://www.medicinenet.com/radiculopathy /article.htm (Last accessed February 17, 2012).  Radiculitis is "inflamation of the root of a spinal nerve, especially of that portion of the root which lies between the spinal cord and the intervertebral canal." Dorland's Illustrated Medical Dictionary, 1405 (27th Ed. 1988).

Vicodin,[34] Celebrex, Darvocet, and Flexeril;[35] that Nicely's activities were limited because of pain with walking one block and difficulty sleeping in all positions because of pain; and that Nicely's prognosis for recovery was "poor as this condition has exceeded 12 months duration." Tr. 460.

On December 2, 2002, Nicely was evaluated by Mohammad Ashfaq, M.D., a psychiatrist, at the Charles Cole Memorial Hospital, Coundersport. Tr. 521-520.  Dr. Ashfaq diagnosis was that Nicely suffered from bipolar disorder, not otherwise specified, and gave Nicely a Global Assessment of Functioning (GAF) score of 60.[36]  Id.

On February 12, 2003, Nicely had an appointment with Dr. Floyd regarding her low back pain and generalized body pain and fatigue. Tr. 746.  A physical examination revealed  a negative straight leg raise test; diminished lumbar spine range of motion with

---

[34]Vicodin, a combination of acetaminophen and hydrocodone, is a narcotic pain reliever.  Vicodin, Drugs.com, http://www.drugs.com/vicodin.html (Last accessed February 17, 2012).

[35]Flexeril is a muscle relaxant which works by blocking nerve impulses that are sent to the brain. Flexeril, Drugs.com, http://www.drugs.com/pro/flexeril.html (Last accessed February 17, 2012)

[36]The GAF score allows a clinician to indicate his judgment of a person's overall psychological, social and occupational functioning, in order to assess the person's mental health illness.  *Diagnostic and Statistical Manual of Mental Disorders* 3–32 (4th ed. 1994). A GAF score is set within a particular range if either the symptom severity or the level of functioning falls within that range. Id. The score is useful in planning treatment and predicting outcomes. Id.  A GAF score of 31-40 represents some impairment in reality testing or communication or major impairment in several areas,  such as work or school, family relations, judgment, thinking or mood. Id.  A GAF score of 41-50 indicates serious symptoms or any serious impairment in social, occupational or school functioning.  Id.  A GAF score of 51 to 60 represents moderate symptoms or any moderate difficulty in social, occupational, or school functioning. Id. A GAF score of 61 to 70 represents some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well with some meaningful interpersonal relationships. Id.

flexion and extension; discomfort with extension and flexion at the L4-5 and L5-S1 levels of the lumbar spine; upper thoracic spine kyphosis[37]; and generalized discomfort and trigger point activity upon deep palpation around the lumbar paraspinals and quadratus lumborum.[38] Id.  Dr. Floyd's assessment was that Nicely suffered from low back and intermittent lower extremity pain; discogenic low back pain with no neurological deficit with probability of L4-5 and/or L5-S1 annular tear and intermittent chemical radiculitis; generalized body pain and fatigue with possibility of fibromyalgia syndrome and depression; and deconditioning and overweight. Id.

In 2004, Nicely commenced treating with Jon R. Grigg, M.D., a psychiatrist located in Coundersport. Tr. 538-545.  Dr. Grigg concluded that Nicely suffered from bipolar disorder and that Nicely was markedly limited in several mental functional abilities, including the ability to carry out detailed instructions, maintain attention and concentration for extended periods of time, perform activities within a schedule, and maintain regular attendance and be punctual within customary tolerance.  Tr. 541.  On December 27, 2005, Dr. Grigg prepared a report which stated in pertinent part as follows:

> Ms. Nicely has been under my care since August 14, 2004 for bipolar disorder, mixed, and previous polysubstance, in remission; I feel Ms. Nicely has been and continues to be totally disabled without consideration of any past or present drug and/or alcohol use.  I continue to see her monthly; her prognosis for improvement remains poor. Ms. Nicely also has a lengthy psychiatric history beginning in October

---

[37]Kyphosis is defined as "abnormally increased convexity in the curvature of the thoracic spine as viewed from the side; hunchback." Dorland's Illustrated Medical Dictionary, 886 (27th Ed. 1988).

[38]The quadratus lumborum is a four-sided flat muscle located in the lumbar region of the spine from the hip bone to the twelfth rib and transverse processes of the upper lumbar vertebrae.

2002.  I have had the opportuninty to review the following reports:

Dr. Mohammad Ashfaq saw Ms. Nicely for a psychiatric evaluation on December 2, 2002. . . Dr. Ashfaq diagnosed bipolar disorder, NOS and history of back pain. . . .

Clarrisse Wilson, MSW, began treating Ms. Nicely on October 3, 2002. . . . Ms. Wilson diagnosed bipolar disorder, NOS, and history of back problems. . . Ms. Wilson reported that Ms. Nicely was significantly limited in the ability to maintain attention and concentration for extended periods, her ability to sustain ordinary routine without supervision, her ability to make simple work related decisions, her ability to complete a normal workweek without interruption from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, and her ability to interact with the general public.

I have reviewed the above reports of Dr. Ashfaq and Ms. Wilson, and I agree with the severity of their findings.

In my experience with Ms. Nicely, I have consistently noted clinical findings and symptoms of appetite disturbance with weight change, sleep disturbance, mood disturbance, emotional lability, anhedonia or pervasive loss of interests, inappropriate suspiciousness, difficulty thinking or concentrating, social withdrawal, constricted effect, decreased energy, generalized persistent anxiety, hostility and irritability, agitation, and racing thoughts.

As a result of her impairments, Ms. Nicely remains effectively precluded from . . . the ability to carry out detailed instructions, ability to maintain attention and concentration, ability to perform activities within a schedule . . . ability to complete a normal workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  . . . The patient is incapable of even low stress and would be absent from work more than three times a month . . . .

In my best medical judgment, including personal experience with Ms. Nicely and review of her other mental health treatment records, the above symptoms and limitations have been present since April of 1999, and likely earlier.  It is also clear that her drug and/or alcohol use is not material to Ms. Nicely's ability to work as the psychiatric problems alone cause the limitations discussed.

Tr.  690-691.

25

On July 21, 2005, William Jamack, D.O., a psychiatrist, evaluated Nicely on behalf of the Bureau of Disability Determination. Tr. 682-688.  Dr. Jamack concluded that Nicely suffered from bipolar disorder, generalized anxiety disorder, opiate dependence, cocaine dependence, in sustained remission and a history of cannabis abuse.  He further found that she had a current GAF score of 55. Id.

## DISCUSSION

The administrative law judge applying the GRID regulations found that Nicely was disabled and eligible for an award of SSI benefits as of July 8, 2004, the date she turned 55 years of age.  However, with respect to her abilities prior to that date the administrative law judge after proceeding through the 5-step sequential evaluation process found that Nicely was not disabled.  Those steps are as follows.

The administrative law judge at step one of the sequential evaluation process found that Nicely did not engage in substantial gainful work activity since April 30, 1999, the alleged onset date. Tr. 23.

At step two of the sequential evaluation process, the administrative law judge found that Nicely had the following severe impairments: "degenerative disc disease of the lumbar spine, fibromyalgia, a generalized anxiety disorder and a history of chemical dependence." Id.   The administrative law judge further found that Nicely's "allegations of hepatitis C and cerebrovascular accident are non-severe impairments"[39] and that "[m]edical evidence shows that [Nicely] remains abstinent from chemical dependence, and has been sober for a number of years." Tr. 24.

---

[39]Nicely suffered a stroke in March, 2004, after her date last insured for disability insurance benefits. Tr. 24.

At step three of the sequential evaluation process the administrative law judge found that Nicely's impairments did not individually or in combination meet or equal a listed impairment. Tr. 24.

At step four of the sequential evaluation process the administrative law judge found that Nicely could not perform her past relevant work as a post office clerk but that Nicely prior to July 8, 2004, had the residual functional capacity to perform a limited range of light work as defined in the regulations. Tr. 25-26.  Specifically, the administrative law judge found that Nicely could perform light work except Nicely could only "occassionally understand remember and carry-out complex and detailed instructions, directions and tasks," had to have "a sit/stand option after thirty minutes" and could only "occasionally interact with the general public." Id.  In so finding the administrative law judge rejected the opinion of Dr. Callahan that Nicely could not engage in full-time sedentary work and the opinion of Dr. Nedurian that Nicely could only engage in sedentary work.  The administrative law judge did not point to any medical opinion regarding the physical functional abilities of Nicely that was contrary to the opinion of Dr. Nedurian and supportive of the finding that Nicely could engage in the physical exertional requirements of a limited range light work.

At step five, the administrative law judge based on a residual functional capacity of a limited range of light work as described above and the testimony of a vocational expert found that Nicely had the ability to perform unskilled light work as a collator and laundry sorter, and that there were a significant number of such jobs in the national economy and in the economy of the Northwestern region of Pennsylvania. Tr. 36

The administrative record in this case, as stated in footnote 6, is 792 pages in length and we have thoroughly reviewed that record.  Nicely argues, *inter alia*, that the

administrative law judge erred when he (1) failed to appropriately consider the opinions of treating medical providers, including Dr. Callahan, (2) failed to properly evaluate Nicely's subjective complaints, and (3) applied the GRID regulations mechanically and failed to give appropriate consideration to Nicely's borderline age situation.  Those arguments have substantial merit.  In addition to those errors, the administrative law judge erred at step two of the sequential evaluation process.  We will begin with that error.

The Social Security regulations contemplate the administrative law judge considering whether there are any medically determinable impairments and then when setting a claimant's residual functional capacity considering the symptoms of both medically determinable severe and non-severe impairments. 20 C.F.R. § 404.1529.  The determination of whether a claimant has any severe impairments, at step two of the sequential evaluation process, is a threshold test. 20 C.F.R. § 404.1520(c).  If a claimant has no impairment or combination of impairments which significantly limit the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled" and the evaluation process ends at step two.  Id.  If a claimant has any severe impairments, the evaluation process continues.  20 C.F.R. § 404.1520(d)-(g).  A failure to find a medical condition severe at step two will not render a decision defective if some other medical condition was found severe at step two.  However, all of the medically determinable impairments both severe and non-severe must be considered at step four when setting the residual functional capacity.  The social security regulations mandate such consideration and this court has repeatedly so indicated. See, e.g., Christenson v. Astrue, Civil No. 10-1192, slip op. at 12 (M.D. Pa. May 18, 2011)(Muir, J.); Little v. Astrue, Civil No. 10-1626, slip op. at 19-21 (M.D.Pa. September 14, 2011)(Kosik, J.); Crayton v. Astrue, Civil No. 10-1265, slip op. at 32-35 (M.D.Pa.

September 27, 2011); 20 C.F.R. §§ 404.1523, 404.1545(a)(2), 416.923 and 416.945(a)(2).

The record indicates that in addition to a generalized anxiety disorder Nicely was  diagnosed on several occasions with bipolar disorder and depression.  The failure of the administrative law judge to find those psychiatric conditions as medically determinable impairments, or to give an adequate explanation for discounting them, makes his decisions at steps two and four of the sequential evaluation process defective.

The error at step two of the sequential evaluation process draws into question the administrative law judge's residual functional capacity determination and assessment of the credibility of Nicely.   The administrative law judge found that Nicely medically determinable impairments could reasonably cause Nicely's alleged symptoms but that Nicely's statements concerning the intensity, persistence and limiting effects of those symptoms were not credible prior to July 8, 2004.  This determination by the administrative law judge was based on an incomplete and faulty analysis of all of Nicely's medically determinable impairments.

The administrative law judge rejected the opinion of Dr. Callahan,  a treating physician, regarding the physical functional abilities of Nicely.  The preference for the treating physician's opinion has been recognized by the Court of Appeals for the Third Circuit and by all of the federal circuits. See, e.g., Morales v. Apfel, 225 F.3d 310, 316-18 (3d Cir. 2000). When the treating physician's opinion conflicts with a non-treating, non-examining physician's opinion, the administrative law judge may choose whom to credit in his or her analysis, but "cannot reject evidence for no reason or for the wrong reason." Id.  In choosing to reject the evaluation of a treating physician, an administrative law judge may not make speculative inferences from medical reports and may reject treating physician's opinions

outright only on the basis of contradictory medical evidence. Id.  An administrative law judge may not reject a written medical opinion of a treating physician based on his or her own credibility judgments, speculation or lay opinion. Id.  An administrative law judge may not disregard the medical opinion of a treating physician based solely on his or her own "amorphous impressions, gleaned from the record and from his evaluation of the [claimant]'s credibility." Id.  As one court has stated, "Judges, including administrative law judges of the Social Security Administration, must be careful not to succumb to the temptation to play doctor" because "lay intuitions about medical phenomena are often wrong." Schmidt v. Sullivan, 914 F.2d 117, 118 (7th Cir 1990).

        The administrative law judge in setting the residual functional capacity of Nicely at a limited range of light work only relies on his lay analysis of the bare medical records and his assessment of Nicely's credibility and her activities of daily living.  Nicely's activities of daily living do not support the conclusion that she can engage in the physical exertional requirements of  full-time light work (8 hours per day, 5 days per week) or other similar schedule. The testimony of Nicely regarding her activities of daily living (which the ALJ relies on) indicates that those activities were sporadic.  Sporadic activities have long been considered by the Court of Appeals for this circuit as not establishing the ability to work. Smith v. Califano, 637 F.2d 968, 971-972 (3d Cir. 1981); Wright v. Sullivan, 900 F.2d 675, 682 (3d Cir. 1990).  Anecdotal evidence of a claimant's sporadic activities is not a sufficient basis to reject the opinion of a treating physician. Id.  As this court has noted "the law does not require a complete restriction from recreational and other activities as a prerequisite to a finding of disability." Rieder v. Apfel, 115 F.Supp.2d 496, 504-505 (M.D.Pa. 2000)(Munley, J.).  As for the issue of  credibility Morales clearly indicates that an administrative law judge

may not reject a written medical opinion of a treating physician regarding a claimant's physical limitations based on his or her assessment of the claimant's credibility.

This case is troubling because if Nicely would have been limited to sedentary work she would have been entitled to benefits under the GRID regulations.  In addition to rejecting the opinion of Dr. Callahan, the last administrative law judge who heard this case rejected the opinion of Dr. Nedurian even though the first administrative law judge who heard the case on November 20, 2002,  accepted Dr. Neudurian's opinion that Nicely was limited to sedentary work.  The last administrative judge oddly rejects Dr. Nedurian's opinion in part because he was not a treating physician and also engages in lay medical analysis when he states that Dr. Nedurian's assessment that Nicely "could not stand and/or walk for more than two hours total in an eight hour day . . . conflicts with his clinical findings."   Furthermore,  it is safe to assume that Dr. Nedurian in issuing his opinion not only relied on his physical examination of Nicely but on his review of the medical records up to that point, including Dr. Callahan's records of his treatment of Nicely.

Finally, there is merit to Nicely argument that the administrative law judge mechanically applied the GRID regulations.  Several district courts in Pennsylvania have held that when a claimant is six or seven months shy of his or her 55th birthday, the administrative law judge must engage in borderline analysis and cannot mechanically apply the GRID regulations. See, e.g., Morealli v. Astrue, No. 08-CV-356, 2010 WL 654396 at *9 (W.D. Pa. Feb. 23, 2010); Itsik v. Astrue, No. 07-CV-1468, 2009 WL 382503 at *4 (W.D. Pa. Feb. 13, 2009).  In these cases, it was held that it was error for the administrative law judge to fail to consider or address the borderline age issue because that consideration may have resulted in a change in the outcome of the case.

Our review of the administrative record reveals that the decision of the Commissioner is not supported by substantial evidence.

The vocational expert who testified at the administrative hearing on May 21, 2009, indicated that if Dr. Nedurian's limitations were accepted the only work available would be sedentary work.  Tr. 789-792.  The administrative law judge found that Nicely could not perform her prior relevant, semi-skilled light work and that she was limited to unskilled work. Consequently, if Dr. Nedurian's opinion was accepted under GRID Rule 201.6 Nicely would be considered disabled.

The district court can award benefits only when the administrative record of the case has been fully developed and when substantial evidence on the record as a whole indicates that the plaintiff is disabled and entitled to benefits. Gilliland v. Heckler, 786 F.2d 178 (3d Cir.1986); Tennant v. Schweiker, 682 F.2d 707, 710 (8th Cir.1982).  When faced with such cases, it is unreasonable for the court to give the administrative law judge another opportunity to consider new evidence concerning the disability because the administrative proceeding would only result in further delay in the receipt of benefits. See Livingston v. Califano, 614 F.2d 342, 345 (3d Cir.1980).  The decision whether to reverse or remand lies within the discretion of the court. See, e.g., Gilliland, 786 F.2d at 185; Rini v. Harris, 615 F.2d 625, 627 (5th Cir.1980).

In the present case, we find that the record is extensive and well developed. The record as noted consists of 792 pages and includes the medical records of several doctors who have examined Nicely  Substantial evidence in that record – Dr. Callahan's disability opinion and Dr. Nedurian's opinion in conjunction with the testimony of the vocational expert  –  indicate that Nicely is disabled and entitled to receive benefits without

further extended delay.  Under the circumstances, we see no reason to remand for further consideration of whether Nicely is disabled.

We have determined, therefore, that the decision of the Commissioner should be reversed with the direction that benefits be awarded to Nicely, as we find that substantial evidence does not support the decision that Nicely was not disabled under the Act.  The Commissioner will be directed to award benefits to Nicely as of April 2, 2002, the date Dr. Nedurian issued a physical functional assessment  which limited Nicely to sedentary work.

An appropriate order will follow.

/s/ A. Richard Caputo
A. RICHARD CAPUTO
United States District Judge

Dated: April 11, 2012